IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ELLIOTT CHERRY, | ) | CASE NO. 5:04 CV 31 |
| | ) | |
| Petitioner, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| STUART HUDSON, | ) | |
| | ) | |
| Respondent. | ) | **REPORT & RECOMMENDATION** |

## I.    Introduction

Before the Magistrate Judge by referral is the *pro se* petition of Elliot Cherry for a writ of habeas corpus.[1] Cherry is presently incarcerated at the Mansfield Correctional Institution following conviction by a jury of one count of child endangering and one count of murder.[2] In his habeas petition, Cherry asserts five grounds for relief.[3]

The state acknowledges custody of Cherry on the aforementioned convictions.[4]  In response to Cherry's claims, it argues that Cherry's fifth ground for habeas relief should be dismissed as procedurally defaulted[5] and that the remaining grounds be denied inasmuch as

---

[1] ECF # 1.

[2] *Id.*

[3] *Id.*, Ex. 1 (Petitioner's Brief) at 1.

[4] ECF # 10 at 1.

[5] *Id.* at 11.

the decision by the state appeals court in each respect was not an unreasonable application of clearly established federal law.[6]

For the reasons that follow, the Magistrate Judge recommends dismissing Cherry's fifth ground for habeas relief as procedurally defaulted, denying three of the remaining four grounds (one, three, and four) since the state appellate court decision rejecting those claims was, in each case, not an unreasonable application of clearly established federal law, and dismissing the final ground (two) in that the asserted error does not violate any clearly established federal law.

## II.    Facts and Court Proceedings

### A.    *Trial*

The underlying facts developed at trial were found by the state appeals court that reviewed Cherry's conviction to be as follows:[7]

{¶2}    On the evening of May 1, 2001, Appellant was at the apartment of his girlfriend, Jocola Martin.  Appellant was alone in the apartment with Ms. Martin's thirteen-month-old son Elijah Kimbrough and Appellant's one and one-half -year-old daughter, Zorrie; Ms. Martin had gone to work earlier in the evening.

{¶3}    At approximately 10:21 p.m., 911 dispatchers received a call from Appellant.  Appellant told the dispatchers that Elijah had fallen down a stairway and had stopped breathing.  Emergency medical technicians and police officers responding to the call converged on the apartment.

---

[6] *Id.* at 12-18.

[7] Facts found by the state appeals court in review of the trial record are entitled to a presumption of correctness by the federal habeas court.  *Brumley v. Wingard*, 269 F.3d 629, 637 (6th Cir. 2001).

Elijah was rushed to Children's Hospital, where he was pronounce dead at 11:10 p.m.

{¶4}   Two days later, Appellant was indicted on one count of murder, in violation of R.C. 2903.02(B) with the predicate offense of felonious assault, in violation of R.C. 2903.11(A)(1); and endangering children, in violation of R.C. 2919.22(A).  A supplemental indictment was filed three months later charging Appellant with murder in violation of R.C. 2903.02(B) with the predicate offense endangering children; and endangering children in violation of R.C. 2919.22(B)(1).

[¶ 5]   Appellant filed a motion to suppress oral statements made to police officers, which the trial court ultimately denied after a hearing on the matter.  Appellant also filed motions to dismiss both counts of the indictment charging Appellant with felony murder because of various constitutional infirmities, which the trial court also denied after a hearing.  Appellant's jury trial commenced on August 20, 2001.

{¶ 6}   At trial, Officer Aey testified that he was one of the officers who was dispatched to the apartment from which Appellant had placed the 911 call. Officer Aey stated that he spoke with Appellant after the medical personnel had taken Elijah to the hospital, and at that time Appellant had related the following sequence of events: Appellant was doing laundry in the lower level of the apartment when he heard a "thud." Appellant went to the stairway, and found Elijah at the second or third step from the bottom.  The infant gasped as Appellant took Elijah in his arms and carried him up the stairs, and Appellant told him to breathe. When they reached the top of the stairs, Appellant set the child down and telephoned his mother and 911.  According to Officer Aey, Appellant reported that Elijah had a history of falling down steps, and had fallen down the steps of the third level stairway earlier in the day.

{¶7}   Sergeant Hudnall of the Akron Police Department also testified at Appellant's trial. Sergeant Hudnall stated that he was another of the officers who responded to Appellant's 911 call, and interviewed Appellant at the apartment.  The Sergeant testified that Appellant told him Elijah had fallen down the steps of the basement stairway while he was doing laundry.

{¶8}   The state also presented testimony from Detective Hamas of the Akron Police Department.  Detective Hamas testified that he arrived at the

apartment while Sergeant Hudnall was talking to Appellant.  Detective Hamas stated that Appellant voluntarily agreed to accompany him to the police station to give a statement to the police.  The Detective testified that he and Detective Vincent Benson questioned Appellant in an interview room at the detective bureau, where Appellant repeated his account of Elijah's fall down the basement steps.  After the interview, Detective Benson took Appellant home.

{¶9}  Detective Benson was the state's next witness at the trial.  Detective Benson's description of what Appellant told the detectives during the interview at the detective bureau matched the account given by Detective Hamas.  In addition, Detective Benson stated that Appellant agreed to return to the police station with Ms. Martin the following day at noon.

{¶10}  The next day, Appellant and Ms. Martin came back to the police station for further questioning.  After the detectives interviewed Ms. Martin, Appellant was brought to the interview room.  Detective Benson testified that Appellant was voluntarily in the interview room, and was free to leave.  Present in the interview room with Appellant was Detective Benson, Detective Dalvin Horton, and assistant city prosecutor Tom Dicaudo.  Detective Benson then testified to the following sequence of events: After Appellant repeated his account of Elijah's fall down the stairs, one of the interviewers interjected that the coroner had informed them that Elijah's injuries were not caused by a fall down the stairs, but by a blunt force trauma to the abdomen.  At some point during the questioning, the interviewers placed in front of Appellant a picture of Elijah's open abdominal cavity taken during the child's autopsy.  The picture showed multiple tears in the child's liver.  Upon seeing the photograph, Appellant dropped his head and said, "his life was over." Appellant admitted that the child had been irritating him, and that he had "backhanded Elijah in the stomach" one time. The detectives then told Appellant he was under arrest, and Detective Horton was asked to read Appellant his *Miranda* rights.  Detective Benson retrieved a tape recorder from his desk, and Detective Horton explained to Appellant that with his permission, they were going to tape record Appellant's confession. Appellant agreed, and the detectives asked Appellant to repeat his confession on tape. The tape of Appellant's confession was admitted into evidence at the trial, and was played for the court and the jury.

-4-

{¶11} Dr. Lisa Kohler, Chief Medical Examiner of Summit County, also testified at the trial. Dr. Kohler stated that she performed an autopsy on Elijah's body, which revealed two large tears in the infant's liver, lacerations in the membrane holding the bowels in place, and subdural bleeding. According to Dr. Kohler, the tears in the liver were the result of a deeply penetrating blow administered with significant force from an object with a small surface area, such as a fist or a heel. Dr. Kohler testified that the cause of Elijah's death was blood loss due to blunt force injury to the abdomen. The doctor said that the child's injury could not have been caused by a fall down the steps.

{¶12} The jury found the Appellant not guilty of felonious assault and not guilty of murder with the predicate offense of felonious assault, but guilty of child endangering and guilty of murder with the predicate offense of child endangering. The trial court sentenced Appellant to serve eight years in prison for child endangering and fifteen years to life for murder.[8]

## B.    Direct appeals

Cherry, represented by different counsel from the one representing him at trial,[9] timely appealed these convictions to the state appellate court[10] raising four assignments of error:

1.    Appellant Cherry's conviction for murder under R.C. 2903.02(B) violated his due process and equal protection rights as guaranteed by Sections 1 and 2, Article I of the Ohio Constitution, and the Fourteenth Amendment to the United States Constitution. (Motion Hearing, August 10, 2001).

---

[8] *State v. Cherry*, No. 20771, 2002 WL 1626105, at **1-3 (Ohio App. 9 Dist. July 24, 2002). *See also*, ECF # 11 at 99-104. The appeals court decision is part of the record here which was, pursuant to an order of the Magistrate Judge (ECF # 6), presented as a sequentially Bates-stamped compendium. A copy of the Westlaw version is attached for the convenience of the District Judge.

[9] J. Dean Carro of the Appellate Review Office, University of Akron School of Law, was counsel on appeal. *See*, ECF # 11 at 51. Joseph Gorman was counsel at trial. *Id*. at 5.

[10] *See*, *Cherry*, 2002 WL 1626105, at *3.

-5-

2.      The trial court erred in not suppressing Appellant Cherry's statements made to the Akron police department when, under the totality of the circumstances, during a police interrogation, a reasonable person would not have believed he was free to leave, the interrogating law enforcement officers are required to give a suspect the warnings required by *Miranda v. Arizona* (1966), 384 U.S. 436, therefore violating the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. (Journal Entry, September 17, 2001).

3.      The trial court erred in sentencing Appellant Cherry for child endangering and murder because those crimes constitute allied offenses of similar import in violation of the double jeopardy clauses of Article I, Section 10 of the Ohio Constitution and the Fifth Amendment of the United States Constitution. (September 5, 2001 journal entry).

4.      The trial court erred in declining to instruct the jury on the lesser included/lesser offense of involuntary manslaughter to murder, in violation of Appellant Cherry's right to due process of law under the Fourteenth Amendment to the United States Constitution. (Tr. Vol. VI at 692).[11]

The state appeals court overruled all of Cherry's assignments of error and affirmed the judgment of the trial court on July 24, 2002.[12]

On July 30, 2002, Cherry sought a reconsideration of the decision on appeal, or, alternatively, sought to have the appeals court certify a conflict with another Ohio appeals court to the Ohio Supreme Court.[13]  Finding no basis for reconsideration, nor any conflict

---

[11] ECF # 11 at 16-17.

[12] *Cherry*, 2002 WL 1626105, at *14.

[13] ECF # 11 at 130.

with another Ohio appeals court, the appellate court declined to reconsider and denied the

motion to certify.[14]

Cherry, represented again by the counsel who prepared the appeal to the state appeals

court, on September 9, 2002, timely sought review of the appellate court's decision by the

Ohio Supreme Court, propounding the following four propositions of law:

1. Murder, under R.C. 2903.02(B), and the predicate offense of child endangering in violation of R.C. 2919.22(B)(1) are allied offenses of similar import when the conduct supporting the child endangering is also used to support the murder charge.  A conviction on both of these offenses is a violation of the multiple counts statute, R.C. 2941.25, and is a double jeopardy violation under section ten, article one of the Ohio Constitution and the Fifth Amendment to the United States Constitution.

2. Involuntary manslaughter is a lesser degree offense of murder and the trial court's refusal to instruct the jury accordingly violated Appellant Cherry's right to due process of law under the Fourteenth Amendment to the United States Constitution.

3. R.C. 2903.02(B) is unconstitutional because it violates due process and equal protection rights as guaranteed by sections two and ten, article one of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution.  R.C. 2903.02(B) violates these rights because it does not require the predicate felony supporting a murder conviction to be independent of the conduct which kills, it allows non inherently dangerous felonies to be used as the predicate felony to murder, it relieves the State of the burden of proving the offender "purposely" took the victim's life, and places undue discretion in the hands of the prosecutor in charging a defendant with murder under R.C. 2903.02(B) or involuntary manslaughter under R.C. 2903.04.

4. The trial court erred in not suppressing Appellant Cherry's statements to the Akron Police Department during the police interrogation when, under the totality of the circumstances, a reasonable person would not

---

[14] *Id.* at 174-76.

have believed he was free to leave, and the interrogating officers were required to give him his warnings required by *Miranda v. Arizona* (1966), 384 U.S. 436, therefore violating the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.[15]

The state opposed leave to appeal.[16]  The Ohio Supreme Court dismissed his appeal on December 18, 2002.[17]  No petition was filed with the United States Supreme Court seeking a writ of certiorari.  Accordingly, Cherry's conviction became final on March 18, 2003, or ninety days after the dismissal of his appeal by the Ohio Supreme Court.

### C.    *Application to re-open the appeal*

Now proceeding *pro se*, Cherry sought to re-open his appeal on July 16, 2003.[18]  In his application, Cherry claimed that his appellate counsel was ineffective for not properly raising the issue of ineffectiveness of trial counsel, despite having been asked to do so by Cherry, and that the underlying ineffectiveness of trial counsel – not requesting the proper predicate offense of child endangering when asking for a jury instruction on the lesser included offense of manslaughter – was prejudicial.

The state opposed Cherry's application, citing, among other reasons, that it was untimely filed.[19]  As the state observed, applications for reopening under Ohio Appellate Rule 26(B)(1) must be filed within ninety days of the judgment or good cause be shown for

---

[15] *Id*. at 178.

[16] *Id*. at 228-342.

[17] *Id*. at 343.

[18] *Id*. at 344-65.

[19] *Id*. at 374.

-8-

the untimeliness.[20]  The state argued that Cherry's explanation for his untimely filing – that he was given bad advice on the applicability of the limitations section of Rule 26 by his appellate counsel – was equivalent to claiming ineffective assistance of counsel under the circumstances, *i.e.*, the filing of a Rule 26(B) application, where there is no right to counsel in the first instance.[21]

On August 6, 2003, the state appeals court agreed and denied Cherry's motion as untimely, noting that ignorance of the time requirement is not a good cause for being untimely under Rule 26(B).[22]  In denying Cherry's Rule 26(B) application on the basis of its untimeliness, the court did not reach the merits of the underlying claim.

Cherry, again proceeding *pro se*, on September 15, 2003, thereupon sought to appeal the dismissal of his Rule 26(B) application to the Ohio Supreme Court, raising a single proposition of law:

> The Appellant was denied effective assistance of appellate counsel in violation of Article I, Section 10 of the Ohio Constitution and the Fourteenth Amendment to the U.S. Constitution for failing to raise the issue that appellant was denied the effective assistance of trial counsel.[23]

The Ohio Supreme Court dismissed the appeal on November 5, 2003, without addressing the underlying claim.[24]

---

[20] *Id.*

[21] *Id.*

[22] *Id.* at 379.

[23] *Id*. at 381.

[24] *Id*. at 398.

-9-

**D.      *Federal habeas petition***

Cherry filed the present petition for federal habeas relief on January 17, 2004,

asserting five grounds for relief:

1.      Murder, under R.C. 2903.02(B), and the predicate offense of child
endangering in violation of R.C. 29219.22(B)(1) [sic] are allied
offenses of similar import when the conduct supporting the child
endangering is also used to support the murder charge. A conviction on
both of these offenses is a violation of the multiple counts statute,
R.C. 2941.24, and is a double jeopardy violation under section ten,
article one of the Ohio Constitution and the Fifth Amendment of the
United States Constitution.

2.      Involuntary manslaughter is a lesser included offense of murder and the
trial court's refusal to instruct the jury accordingly violated petitioner
Cherry's right to due process of law under the Fourteenth Amendment
to the United States Constitution.

3.      R.C. 2903.02(B) is unconstitutional because it violates due process and
equal protection rights as guaranteed by sections two and ten,
article one of the Ohio Constitution and the Fourteenth Amendment to
the United States Constitution.

4.      The trial court erred in not suppressing petitioner Cherry's statements
to the Akron Police Department during the police interrogation when,
under the totality of the circumstances, a reasonable person would not
have believed he was [free] to leave, and the interrogating officers were
required to give him his warnings required by *Miranda v. Arizona*
(1966), 384 U.S. 436, therefore violating the Fifth, Sixth, and
Fourteenth Amendments to the United States Constitution.

5.      The petitioner was denied effective assistance of counsel in violation
of Article I[,]Section 10 of the Ohio Constitution[,] and the Sixth and
Fourteenth Amendment[s] to the U.S. Constitution for failing to raise
the issue that petitioner was denied the effective assistance of trial
counsel.[25]

---

[25] ECF # 1, Ex. 1 at 1.

As noted, the state filed a return, asserting first that Cherry's fifth basis for the writ – which restates the claim originally set forth in his Rule 26(B) application and was left unaddressed on its merits by state courts due to the application's untimely filing – should here be dismissed as procedurally defaulted.[26]  The state further argues that the remaining grounds for habeas relief were considered on appeal and found to be without merit, and so the current petition should likewise be denied inasmuch as the state court's decisions were not unreasonable applications of clearly established federal law.[27]

Cherry filed a traverse.[28]  In that traverse, Cherry re-states his arguments as to grounds one through four and further contends that the procedural default alleged as to ground five should be excused by the ineffectiveness of his appellate counsel.[29]  Cherry does not, however, offer any explanation of how actions taken by counsel during the direct appeal can excuse the untimeliness of a Rule 26(B) post-conviction application which was filed *pro se.* Nor does he address the state's previously-stated argument that, since there is no right to counsel for post-conviction proceedings like the Rule 26(B) reopening, Cherry may not predicate cause for his untimeliness on essentially a claim of ineffective assistance of counsel.

---

[26] ECF # 10 at 12.

[27] *Id.* at 12-18.

[28] ECF # 14.

[29] *Id.* at 1.

The matter is now before the Magistrate Judge by referral from the District Judge with directions to submit a report and recommendation for disposition of the petition.[30]

## III.    Analysis

### A.    *Ground Five has been procedurally defaulted and so should here be dismissed.*

*1.    Standard of review/ procedural default*

As the Sixth Circuit recently stated in *Franklin v. Anderson*:[31]

> Absent cause or prejudice, when a habeas petitioner fails to obtain consideration of a claim by the state courts due to a state procedural Rule that prevents the state courts from reaching the merits of the petitioner's claim, the claim is procedurally defaulted and may not be considered by the federal court on habeas review.[32]

Demonstrating cause requires showing that an "objective factor external to the defense impeded counsel's efforts to comply" with the state procedural rule.[33] Demonstrating prejudice requires that the petitioner show that the claimed constitutional error worked to the petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."[34]

---

[30] ECF # 5.

[31] *Franklin v. Anderson,* 434 F.3d 412 (6th Cir. 2006).

[32] *Id*. at 417.

[33] *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

[34] *United States v. Frady*, 456 U.S. 152, 170 (1982).

The Sixth Circuit has long prescribed that analysis of claims of procedural default be made pursuant to the well-known four-part standard of *Maupin v. Smith*:[35]

> (1)  The court must determine that there is a state procedural Rule that is applicable to the petitioner's claim and that the petitioner failed to comply with that rule; (2) the court must decide whether the state courts actually enforced the state procedural rule; (3) the court must decide if the state procedural Rule is an "adequate and independent" state ground on which the state can rely to foreclose review of the federal constitutional claim; and (4) if this is established, then the petitioner must show that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.[36]

2. *Application of the standard*

Here, there is no dispute that the first two prongs of the *Maupin* test have been met, in that Cherry failed to file his Rule 26(B) application within the time limits imposed by statute and the state appeals court dismissed his application solely because it was untimely filed.  Morever, although not addressed by the parties, Ohio Appellate Rule 26(B) has been held to be an "adequate and independent" state law ground that is "firmly established and regularly followed" in Ohio.[37]

---

[35] *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).

[36] *Id*. at 138 (citations and footnote omitted).  An exception to this analysis can be made in cases where the petitioner can show that the failure to obtain review of his claim will result in a "fundamental miscarriage of justice."  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  That exception has not been advanced here.

[37] *Monzo v. Edwards*, 281 F.3d 568, 577-78 (6th Cir. 2002).  *Accord*, *Williams v. Bagley*, 166 F. App'x 176, 180 (6th Cir. 2006) ("Rule 26(B) is both 'firmly established and regularly followed.'").  The regularity by which Ohio courts apply Rule 26(B) has been called into question, however, in the specific limited context of capital cases.  *See*, *Franklin v. Anderson*, 434 F.3d 412, 420-21 (6th Cir. 2006).

-13-

Accordingly, the *Maupin* inquiry must now proceed to whether Cherry can show cause for failing to comply with the time limitation set forth in Rule 26(B). Cherry, as noted, argues that he was precluded from timely filing because he was given incorrect information as to the time limit for submitting Rule 26(B) applications by his former appellate attorney.[38]

As the state correctly observes, Cherry's contention as to cause amounts to an assertion of ineffective assistance of counsel during the Rule 26(B) application. However, it is well-settled that a defendant is not entitled to counsel beyond the first appeal of right.[39] The Ohio Supreme Court has held that proceedings under Rule 26(B) are discretionary post-conviction proceedings and, thus, no right to counsel attaches during such proceedings.[40] Consequently, Cherry may not excuse his failure to comply with the time limit in Rule 26(B) by arguing that he allegedly received bad advice from his former attorney during the preparation of his Rule 26(B) application.[41]

---

[38] Cherry also makes the assertion that because no state court has reached the merits of his claim of ineffective assistance of appellate counsel in respect of the claim of ineffective assistance of trial counsel, despite that claim having been presented and thus exhausted, this should serve as cause for purposes now of excusing any procedural default. *See*, ECF # 14 at 1-3. Cherry simply confuses the distinct issues of providing "cause" for the failure to present the ineffectiveness of trial counsel argument during his direct appeal, with providing "cause" for not timely filing his post-conviction Rule 26(B) application. Deficiencies of appellate counsel may arguably be cause for the former but, as will be developed later, cannot be cause for the latter.

[39] *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987).

[40] *Morgan v. Eads*, 104 Ohio St.3d 142, 145-47, 818 N.E.2d 1157, 1160-62 (2004).

[41] *See*, *Williams*, 166 F. App'x at 180.

Finally, inasmuch as Cherry has not shown valid cause for his failure to follow the state procedural rule here, it is not necessary to address the issue of prejudice.[42]

Therefore, the Magistrate Judge recommends that Cherry's fifth ground for relief be dismissed as procedurally defaulted.

**B.      Grounds for relief one, three, and four should be denied inasmuch as the state appeals court decision either was not contrary to or reasonably applied clearly established federal law when denying each of them on the merits.**

*1.      Standard of review/contrary to or unreasonable application*

When a habeas petitioner has first presented his claim to the state courts and those courts have adjudicated it, the federal habeas court may not grant the writ unless the state decision was either "contrary to ... clearly established federal law, as determined by the Supreme Court of the United States," or "involved an unreasonable application" of such clearly established federal law.[43]

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrived at a conclusion that was opposite to that reached by the United States Supreme Court on a question of law or decides a case differently than the United States Supreme Court on a set of materially indistinguishable facts.[44]

Where the state court has correctly identified the clearly established federal law as the basis for its decision, the writ may issue only if the federal habeas court determines that it has

––––––––––––––––––––

[42] *Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982).

[43] *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (citing 28 U.S.C. § 2254(d)(1)).

[44] *Id.* at 405-06.

been unreasonably applied to the facts.[45] The proper inquiry is whether the state court decision was "objectively unreasonable" and not merely erroneous or incorrect.[46]

2.      *Application of the standard of review*

a.      Ground one – the asserted double jeopardy claim

Cherry contends that the offenses of murder and child endangering are allied offenses in that the conduct needed to support a conviction for child endangering is the same as that required to support a conviction for murder.[47]  He contends that since his conviction for both offenses were based on the single act of striking Elijah in the abdomen, he was thereby impermissibly put in double jeopardy.[48]

The state court identified no controlling federal law as to double jeopardy but denied Cherry's claim by noting that Cherry had not been put into double jeopardy for the same act since he had received only a single, merged sentence of fifteen years to life upon his conviction for both charges.[49] Accordingly, the state court concluded, because "the sentences were merged by the trial court, as noted by the trial court at the sentencing hearing and in the journal entry, there is no [double jeopardy] error for this court to address."[50]

---

[45] *Id*. at 407-08.

[46] *Id.* at 409-11.

[47] ECF # 1, Ex. 1 at 6.

[48] *Id*. at 8.

[49] *Cherry*, 2002 WL 1626105, at **10-11.

[50] *Id.* at *11.

-16-

In *Rutledge v. United States*,[51] the United States Supreme Court enunciated the clearly established federal law applicable to claims of double jeopardy.  The Supreme Court stated that the test for whether a criminal defendant is susceptible to double jeopardy under two different statutes for the same act or transaction is "whether each provision requires proof of a fact which the other does not."[52]

Here, convicting Cherry of felony murder required proof that his act of striking Elijah proximately caused Elijah's death,[53] something which was not required to convict Cherry of the crime of child endangering.[54]  Conversely, proving the crime of child endangering required evidence that Elijah was a child under eighteen years of age when Cherry struck him, a fact not required to obtain a conviction under Ohio's felony murder statute.

Accordingly, pursuant to the clearly established federal law on double jeopardy originally set forth in *Blockburger v. United States*[55] and reiterated in *Rutledge*,[56] Cherry was

---

[51] *Rutledge v. United States,* 517 U.S. 292 (1996).

[52] *Id*. at 297, quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932).

[53] The felony murder statue, R.C. § 2901.02(B),  provides that:  "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree."

[54] R.C. § 2919.22(B), the child endangering statute, states in pertinent part: "No person shall do any of the following to a child under eighteen years of age ... (1) Abuse the child."

[55] *Blockburger*, 284 U.S. 299.

[56] *Rutledge*, 517 U.S. 292.

not unconstitutionally placed in double jeopardy by his convictions for child endangering and felony murder in that each statute required proof of a fact that the other did not.

Although the state court incorrectly premised its holding denying Cherry's assertion of  double jeopardy on the fact that there was only one merged sentence, the Magistrate Judge recommends finding that the state appeals court conclusion was, nonetheless, not contrary to clearly established federal law, and thus Cherry's claim for habeas  relief here should be denied.

b.      Ground three – the constitutionality of Ohio's felony murder statute

Cherry contends that Ohio's felony murder statute, Revised Code § 2903.02(B), is unconstitutional because it does not require that a defendant be proven to have "purposely" taken the life of another.[57]  As such, Cherry maintains that it improperly gives the state "carte blanche power" to either charge a defendant with murder, and so subject him to a higher penalty, or charge him with involuntary manslaughter, subjecting him to a lesser penalty, since, allegedly, neither statute requires "express intent to kill nor any specified *mens rea*."[58]

Accordingly, Cherry maintains that this defect renders the Ohio statutes violative of the equal protection clause since the two statutes supposedly create two groups of persons – those convicted under each statute – that are treated differently without a rational reason.[59]

---

[57] ECF # 1, Ex. 1 at 15.

[58] *Id.* at 16.

[59] *Id.*

-18-

The state appeals court, after first finding that the equal protection clause of the Ohio Constitution is "functionally equivalent" to the federal clause, requiring the same analysis, cited United States Supreme Court cases for the rule that when statutes, as here, do not involve a suspect class or a fundamental constitutional right, they are to be upheld if they bear a rational relationship to a legitimate state interest.[60]

In this instance, the state court, citing *Hopkins v. Reeves*,[61] found that "felony murder statutes [which involve murder committed in the commission of a felony] pass constitutional muster regarding the *mens rea* issue because those statutes require the state prove the intent of the underlying felony."[62] Accordingly, the state court found that the felony murder statute in Ohio does require a finding that the defendant acted "purposely" in causing the death of another – a finding that rests on the finding of intent to commit the underlying felony, here that Cherry "recklessly" abused Elijah – and so creates an offense different from involuntary manslaughter.[63]

Cherry asserts that this approach is unconstitutional and that the conduct comprising the predicate felony must be wholly separate from that constituting the murder charge.[64] However, as the state appeals court determined, the United States Supreme Court in *Hopkins*

---

[60] *Cherry*, 2002 WL 1626105, at *3.

[61] *Hopkins v. Reeves*, 524 U.S. 88 (1998).

[62] *Cherry*, 2002 WL 1626105, at *6 (citations omitted).

[63] *Id.*

[64] ECF # 14 at 13.

has expressly held that felony murder statutes which establish *mens rea* from the commission of the underlying felony are constitutional.[65]

Cherry's argument that Ohio's felony murder statute and offense of involuntary manslaughter "prohibit identical activity [taking the life of another without intent] yet subject offenders to different punishment"[66] is, therefore, fatally flawed in its premise since, as the state appeals court found, Ohio's felony murder statute does require a finding of intent – supplied by the act of the underlying felony – which is not required by the involuntary manslaughter statute.  Accordingly, absent the erroneous premise that the same action is being punished differently under two separate statutes, Cherry's claim here dissolves.

The Magistrate Judge, therefore, recommends that Cherry's third ground for relief be denied in that the state appeals court did not unreasonably apply the clearly established federal law as to equal protection.

c.    Ground four – Cherry was not "in custody" so as to require his *Miranda* warnings when he confessed.

Cherry's fourth ground for relief posits that he was "in custody" when he gave a confession to the Akron police and should have received his *Miranda* warning prior to making a statement, thus making that incriminating statement inadmissible at trial.[67]

---

[65] *Cherry*, 2002 WL 1626105, at *6, citing *Hopkins*, 524 U.S. at 91-2.

[66] ECF # 14 at 13.

[67] ECF # 1, Ex. 1 at 18-19.

The essence of this claim is Cherry's contention that, pursuant to the holding in *Stansbury v. California*,[68] he did not feel free to leave the interrogation session with the Akron police during which he offered a confession.[69]

The state appeals court initially found that, pursuant to *California v. Beheler*,[70] a person is deemed "in custody," and, therefore, entitled to the *Miranda* warning, "only where there is a restraint on freedom of movement associated with a formal arrest."[71]   In determining if there is such a restraint on freedom of movement as would give rise to a *Miranda* warning, the test is "whether, under the totality of the circumstances, a 'reasonable person would have believed that he was not free to leave.'"[72]  This test does not generally involve an inquiry into the subjective belief of the law enforcement officer conducting the questioning as to the guilt or innocence of the party being questioned.[73]

However, a law enforcement officer's views of the nature of the questioning and on the culpability of the defendant may be, if communicated to the defendant, one factor among others that could affect whether a reasonable person would believe he was free to leave or

---

[68] *Stansbury v. California*, 511 U.S. 318 (1994).

[69] ECF # 1, Ex. 1 at 19.

[70] *California v. Beheler*, 463 U.S. 1121 (1983).

[71] *Cherry*, 2002 WL 1626105, at *9, citing *Beheler*, 463 U.S. at 1125.

[72] *Id*., quoting *State v. Gumm*, 73 Ohio St. 3d 413, 429 (1995), quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

[73] *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

was in custody.[74]  Nonetheless, even "a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."[75]

Under these tests, the state appellate court found that there was no error by the trial court in determining at the suppression hearing that a reasonable person in Cherry's circumstance would have believed himself free to leave the questioning session with the Akron police during which Cherry confessed.[76]

Specifically, the state appeals court found that:

Detective Benson testified at the suppression hearing that after he drove Appellant home from the police station on the night of Elijah's death, he asked Appellant to return with Ms. Martin to the station on the following day at noon. Detective Benson testified that Appellant came to the interview on his own, and that no physical force was used at any time during the interview. The interview took place in a conference room at police headquarters. According to Detective Benson, both he and Detective Horton told Appellant at the interview that he was free to leave, and that he was not under arrest.  The detective stated that Appellant was free to leave at any time prior to his confession, and that the detectives would have let Appellant go if he had started to leave or communicated a desire to leave the interview.

Detective Benson did testify that he did not believe Appellant's story at the interview in question and told him that his account was inconsistent with the findings from Elijah's autopsy. We cannot conclude, however, that this communicated sentiment transformed the interview into a custodial one which would trigger the detectives' duty to issue Appellant *Miranda* warnings. *** Considering the totality of the circumstances, it is clear that Appellant was not in custody at the time he gave his first confession to the detectives.  Moreover,

---

[74] *Stansbury*, 511 U.S. at 324-25.

[75] *Id.* at 325.

[76] *Cherry*, 2002 WL 1626105, at *10.

-22-

it is undisputed that once Appellant stated that he struck Elijah in the stomach, he was formally placed under arrest and properly read his *Miranda* rights.[77]

As this record demonstrates, Cherry voluntarily went to the Akron police station that day; he was not physically restrained in any way during the questioning; he was specifically told that he was free to leave at any time; and, the officers, despite not believing his story about Elijah's death, would have allowed him to leave if had attempted to do so or had asked. Under those facts, which are presumptively true, accepting Cherry's argument that he was entitled to his *Miranda* warning prior to confessing he struck Elijah would be to transform the statement by police during the interrogation that they disbelieved Cherry into a de facto arrest, something that is explicitly contrary to the holding in *Stansbury*.

Accordingly, the Magistrate Judge recommends finding that Cherry's fourth ground for relief be denied in that the state appeals court here did not unreasonably apply the clearly established federal law of when interrogations become custodial, requiring the provision of a *Miranda* warning.

**C.  *Cherry's second ground based on the refusal of the trial court to instruct on involuntary manslaughter does not allege any violation of clearly established federal law.***

Cherry contends in his second ground for relief that his right to due process was violated by the trial court's refusal to instruct the jury on involuntary manslaughter as a lesser included offense of murder.[78] The state appeals court in addressing this argument exclusively

---

[77] *Id.*

[78] ECF # 1, Ex. 1 at 10.

in terms of state law noted that the decision as to whether the evidence presented at trial is sufficient to require the instruction on the lesser included offense is committed to the discretion of the trial court and will not be overturned without a showing of abuse of that discretion.[79]

Save for a single reference to a United States Supreme Court case[80] for the proposition that juries must be given complete instructions as to the applicable law, Cherry has not offered any clearly established federal law by which a federal habeas court may conclude that the state appellate court was erroneous in finding that decisions as to whether to charge the jury on a lesser included offense are purely matters of state law, committed to the discretion of the trial judge.[81]

In fact, as the United States Supreme Court stated in *Beck v. Alabama*,[82] that Court has expressly not undertaken to decide whether the due process clause of the United States Constitution requires that instructions as to lesser included offenses be given in non-capital cases.[83]

---

[79] *Cherry*, 2002 WL 1626105, at **11-12.

[80] *Keeble v. United States*, 412 U.S. 205, 208 (1973).

[81] ECF # 1, Ex. 1 at 10-12.

[82] *Beck v. Alabama*, 447 U.S. 625 (1980).

[83] *Id.* at 638, n.14.  *Accord*, *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) ("[T]he Constitution does not require a lesser-included offense instruction in non-capital cases.") (citing *Bagby v. Sowders*, 894 F.2d 792, 795-97 (6th Cir. 1990) (en banc)).

This absence of any clearly established federal law mandating a jury instruction as to a lesser included offense in a non-capital case is fatal to Cherry's claim for federal habeas relief on the ground that he did not receive such an instruction at trial.  As the Sixth Circuit has observed, "if there is *no* 'clearly established federal law as determined by the Supreme Court,' that supports petitioner's legal argument, the argument must fail."[84]

The Magistrate Judge, therefore, recommends that Cherry's claim for habeas relief on the ground that he did not receive a jury instruction as to lesser-included offenses be dismissed in that it is not based on the violation of any clearly established federal law.

## IV.    Conclusion

Therefore, the Magistrate Judge recommends that Elliot Cherry's petition for a writ of habeas corpus be dismissed in part and denied in part as is more fully set forth herein.

Dated:  August 15, 2006                          s/ William H. Baughman, Jr.
                                                 United States Magistrate Judge

## Objections

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.[85]

---

[84] *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) (quoting 28 U.S.C. § 2254(d)(2)) (emphasis in original).

[85] *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).